Case number 163140, National Credit Union Administration Board of Liquidating Agents of St. Paul Croatian Federal Credit Union v. Cumis Insurance Society Incorporated. Mr. Heintz, you may proceed with the appeal. May it please the Court, I am John Heintz of Blank Rome, representing the Liquidating Agent for St. Paul Croatian Credit Union. I have reserved four minutes for rebuttal. This morning I'd like to address three errors committed by the Court below. One, it didn't apply an actual knowledge test under the termination clause. Two, its finding that Kalavich learned Raguse was dishonest is against the great weight and could have only been reached on a should-have-known basis if it that. And three, termination under the termination clause is prospective only. It doesn't end coverage for acts committed before one learns of the dishonesty of an employee. So let me talk first about actual knowledge under the termination clause, and I've provided to the Court the provisions that are central to today's argument in this case. Under the termination clause, actual knowledge means knowledge of a specific act that would justify charging an employee with dishonesty or fraud. That requires more than suspicion, and it requires an appreciation that the act is dishonest in character. The Court below mistakenly thought that that, rejected that argument because it thought that it focused on whether you appreciated a loss covered under the policy had occurred. But that's not the focus of the termination clause. It's knowledge of a dishonest act by the employee. Explain just factually what it means to say a shared, secured loan. In your responsive brief, I read here that the Board discovered the loss before February 11, 2010. And indeed, the Board discovered the loss no later than 2008 when it learned of five critical factors. One, none of the funds allegedly backing over $131 million in shared, secured loans. And anyway, it goes, how does this? I don't quite understand that. First of all, Your Honor, that's Eppley's brief, not ours. I understand, but I'm asking you a factual question. What a shared, secured loan is, in a credit union, members of the credit union deposit money, and that's considered a share. And if they then take out a loan secured by that deposit, that's called a shared, secured loan. If they make a loan against their own deposit, but it wouldn't be considered a shared loan if you're using other members' deposits. It shouldn't be. It would still be secured, but it shouldn't be considered a shared, secured loan. But part of the fraud here was to make it appear that, in fact, it was the case. So that's what a shared, secured loan is, and those are risk-free loans because dollar for dollar, those loans are intended to be backed by the deposit on hand for the borrower. So that's the essence of a credit union is the core of the credit. Why should not the board have investigated further when it was reported over a substantial period of time that there were no unpaid loans, when the fellow who had been the manager for years said, well, that can't have a situation where there's just none. There are always going to be some loans that are not paid. Well, Your Honor, this I think gets to the core of the factual mistake against the great weight of the evidence that the court below made. There is a great distinction between delinquencies in general and delinquencies over 60 days. And what was being reported as zero in the financial reports to the board were the delinquencies over 60 days. And in a sense for the board, the auditor and the examiners annually investigated the finances of the company, determined whether its finances were sound and healthy, and they note the zero reportable and reported delinquencies. The history of the company showed that if you allow the 60-day period, that it's reasonable to say there are never going to be any unpaid loans after 60 days? Well, Your Honor, there are two factors that could lead to that. And one is that it's good credit union practice, and there's record testimony to that effect, to cure loans as early as possible. And shared secure loans are essentially secured by drawing against the deposit, against the payment that was out. So if you are dominated by shared secured loans, you might not have any delinquencies over 60 days. But the point is, to come back to your question about whether the board should have investigated, which is not the test here because the failure to discover something that might have been learned that would have indicated that Raguse was dishonest. Can we have to apply this discovery of loss language in Section 10 that says, discovery occurs when you first become aware of facts which would cause a reasonable person, whoever that is, to assume that a loss of the type covered under this bond has been or will be incurred? And is the reasonable person standard here, is that a factual issue or a legal question? Well, I would suggest it's a mixed question. Is it a question of the district court addressed here? Your Honor, it says it's applying the actual knowledge test. That's talking about the termination provision. Yes, which I need to. I understand Judge Merritt to be talking about the discovery provisions that deal with it. Right. Those are two different provisions. Very different things. Did the district court at all resolve the issue that Judge Merritt is addressing now? Your Honor, because the court. Yes, just give me the answer and then explain. There's not a clear answer from the court's decision. Not clear whether it addressed it or not? What the court did is that because the ruling it made under the termination clause, it didn't directly address the discovery of loss standard. It conflated the two. So I. You just said because you lose under one, you lose under the other. Well, no, because of the finding I made that the termination came before February 2010. That cuts off all coverage and it flowed without further discussion into the discovery clause and its application. It sounds like the district court did not rely on the discovery issue but rather relied on the termination. Absolutely. And it used its findings. The whole appellate brief deals with the termination, right? Well, it deals with both because the court made a conclusion that the loss was discovered before February of 2010. What I'm saying is it didn't really discuss the basis for that, having already found that the termination clause was triggered by knowledge of Raguse's dishonesty. And to come back to the actual knowledge test under the termination clause, the very fact that Cumas writes a discovery of loss clause with this hybrid reasonable standard and didn't use the same language in the termination clause is fatal to its argument that the test is anything other than an actual knowledge clause. And there is. I would think that you would apply the language of the discovery of the loss clause, become aware of facts which would cause a reasonable person to assume that a loss, et cetera. I would think that stands as a standard to be used with regard to losses, which this is. Your Honor, there are two things that are happening here. The termination clause focuses on whether you know an employee is dishonest. It could be dishonesty entirely unrelated to the credit union. And coverage going forward for that employee is terminated. It's gone. You still have coverage for acts he might have committed before you learned he was dishonest, but you don't for acts committed after. The discovery of loss doesn't focus on whether the employee is dishonest. It focuses on whether you know facts that would lead you to assume a loss had or would occur. So it's focusing on the consequences of dishonest acts. The return of dishonesty and have no loss. Exactly. And, indeed, there are cases. The return of the dishonesty, the termination kicks in. As to coverage for acts committed by that employee after the termination date. In your interpretation. Yes. Well, and there's plenty of case law to that effect in our briefs. But you're only suing on the 2010 bond. Suing under the 2010 bond, but the cases make clear that if you renew the policy year after year, the coverage for the terminated employee for his pre-termination dishonest acts remains in place. And that's home savings and a couple of other cases that we've cited in our briefs. Do you agree to have not only the legal questions, but the facts adjudicated by the magistrate? Yes. So there's no question of a jury. There's never any question about who's supposed to decide the facts. Not when it came time to trial, no. And I, not having been involved in the underlying case, I don't know when that issue, if it came up, was resolved, but it was before trial. So I think it's important to keep clear the difference between the termination clause, which focuses on actual knowledge of dishonesty, and the cases make clear that you don't have a duty to investigate a failure to discover facts that would have led you to determine that the employee was dishonest doesn't trigger the termination clause. They recognize that there's a presumption of honesty, and in a context of a small Croatian church community where the manager was a member of the church of the credit union, his father was on the board, it would take an awful lot to conclude that he had betrayed his trust. And knowing that there were zero delinquencies over 60 days and concluding that they were dishonestly reported as such is a leap in two bounds and requires inferences that under the actual knowledge test could not be made, particularly because the accountant and the examiners on whom the board was entitled to rely were not raising any problems about this. Indeed, the examiners said the zero rate was a positive thing, an indication of good health, and reflected the fact that these were shared secured loans. There was dishonesty going on, right? That's the question I want to lay the foundation for. There was dishonesty going on, right? Yes. So the question is whether it was learned of. Yes. The preliminary question is whether it was learned of. Yes. That's pretty clear. I mean, there's not too much legal play in the meaning of learn. Basically, that's a factual issue, isn't it? Yes. So does that mean we apply clearly erroneous view to whether the relevant person learned of the dishonesty? Yes. We have to say that the trial court was clearly erred in making the finding that there was learning. Is that what we have to do today? I think you have to conclude that, but as part of reaching that conclusion, it's that it implicitly, if not explicitly, applied a should-have-known test in evaluating the evidence. But it relied on this colloquy. I guess it's in Kalavich's testimony. It's in your brief of 32 to 33, but it's in several of the briefs. You parse it to say, well, a delinquency is distinguishable from a reported delinquency. Correct. That's how you tease that out to say that the district court came to the wrong factual determination. Yes. I follow that. It makes sense, but the district court didn't read it that way. That's why we have district courts. That's my concern here. Okay. It sounds like you're parsing this language and say here they use the word delinquency stopped and here you use the word reported delinquency stopped. I guess if I was reading it with your guidance just on the page in front of me, it makes sense what you say, but we have to defer to the district court with respect to factual issues. That's what I'm curious about. Okay. Your Honor, I think that's a proper statement. I'm running out of time for sure. Actually, you have run out of time, but we've asked you a ton of questions and I understand that. If you would finish responding to this one and then you'll reserve your rebuttal time. Thank you. In order to reach the factual determination that the court below did, it had to apply a test that was softer than actual knowledge of the dishonest nature of the act. Yes, I see the report. I think that answered the question. Thank you, counsel. Thank you. Good morning. My name is Joe Neal and I represent Acumas Insurance Society in this case. The court is correct. The standard is clearly erroneous and Judge White was not clearly erroneous. He was correct in his analysis of what the testimony said. In response to a series of questions, the witness said, and he was not just an ordinary witness, he had been on the board for 26 years. He had been president of the board. He said that all during his tenure there were delinquencies reported at the credit union and all of a sudden delinquencies stopped. And he was asked a question, and did the board have concerns about those alleged zero delinquency rates? Answer, from time to time, yes. Question, all right. And your concern was that you knew in fact there was at least some delinquencies based on your own experience as a member of the board, correct? Answer, yes. The district court applied an actual knowledge standard and the district court's finding in that regard was not clearly erroneous. I think I'm looking at the same language. And if you parse it carefully, it doesn't lead to the conclusion that you arrive at because it says the delinquencies stopped and he corrects him by saying the reported delinquencies stopped. And then he goes on to say there are at least some delinquencies, there would be at least some delinquencies, and the answer is yes. So their theory, as I understand it, is sure there were delinquencies. Everybody knew there were delinquencies. The delinquencies stopped. That looked a little unusual, but we, period. Well, I think there are two responses. One, it wasn't. That doesn't show on its face. The district court took that. As I understand it, maybe there was more that the district court relied on. The district court took that to say that's enough to show dishonesty to terminate the liability of the or to terminate the coverage for all actions of this person who agreed that, who asked whom if there was an agreement that the delinquencies stopped. I'm not sure it follows. It looks like it doesn't follow. In my view, it does. And let me try to help the court understand. Number one, it's not clearly erroneous. And number two, the distinction. Well, it's clearly erroneous if the court didn't understand a clear distinction. But there's not. Arguably is between delinquencies and reportable delinquencies. Well, that's. They seem not to understand it. I believe, Your Honor, the record is clear that no witness said that the board was aware of delinquencies but not of reportable delinquencies. In fact, the evidence before the court at the district court level through a series of exhibits, 54 financial statements and minutes that we introduced into evidence, all of them showed 0.00 delinquency rate. No one ever said that they were referring to reportable delinquencies and only reportable delinquencies. Those are reports. I'm sorry? Those are reports. Those are reports. Reports are going to have reportable delinquencies. No, Your Honor. Reports have delinquencies, and they show a 0.00 rate. And the testimony was that for not just a few months, not just a year, but for eight years, there were no reported delinquencies. In fact, the plaintiff stipulated to that before trial. If the court looks at the stipulation, which the parties entered into on November 11th, it's part of the record. Is it dishonest, though? Well, what makes it dishonest is he was telling the board, you have nothing to worry about. We have over $200 million in loans of various types, including $30 million in real estate loans, and not a single loan is late a day. It's not just 60 days. He was telling the board for year after year that there were no delinquencies of any sort, no reasonable person. But that's based on this language here, or is it somewhere else? Well, I've cited the language in terms of the testimony. In terms of the exhibits, we gave the court examples. Exhibits 8, 10, and 12 are examples of the financial reports that we submitted into evidence. We actually put into evidence, and it's part of the record, although I didn't make it part of the appendix, every financial report and meeting from January 1, 2005, through March of 2010 when the credit union closed down, every one of those reports showed a zero delinquency rate, not a zero reportable. The idea that they're proposing, I'm not sure it's right. I'm looking for your guidance. The idea that they're proposing is that the people know that when it says zero delinquencies, it means zero delinquencies over 60 days because those are the ones that are reportable. And everyone knows, or most people know, that the shorter ones don't get reported. And it's unusual not to have any reportable ones. That's unusual. But nobody's really saying that there's none at all. Now, your answer to that is this testimony, which with respect doesn't seem to say that, and these reports. But if the whole idea is that the report doesn't have to have it if it's been dealt with within the 60 days, then that's consistent with that theory as well. What is the clearest part of the record that this view of things is incorrect? I guess that's what I'm asking. The clearest part of the record is the financial statements which Ragu prepared, and that's in the testimony, and that say 0.00 delinquencies. It doesn't say reportable. It doesn't say there's 60 days. Your Honor, but you're introducing. They could have easily asked a question. During this period of time when I questioned the witness, counsel for the government could have easily said, well, aren't you confusing delinquencies and reportable delinquencies? Counsel did not do that. They asked for no clarification. When Mr. Akalovich was talking about those reports, those monthly reports, when I took him through every report, or most of the reports, and pointed that out to him, counsel could have easily asked, well, they only cover reportable delinquencies, not everyday delinquencies. Counsel did not do that. There is no evidence in the record that these documents say other than what they do say, namely 0.00. And that's what is astounding about the case, that for eight years. If you didn't have the delinquent loan problem, you would have a difficult time showing, I take it, that a reasonable person would have looked further to try to discover why there was a problem here, right? No. You would have a... We've given the court... You would have no real notice, would you, absent the delinquency problem, reportable delinquency problem, of why the board should have further looked into Raghu's management. With all due respect, I disagree, and I'll tell you why. Because in May of 2008, the board of directors of this institution, Exhibit No. 54, received the report of the NCUA for the period ending December 31, 2007. That report appears as Exhibit No. 98 in the record, and it's part of the sealed exhibit that the government has submitted. In that report, there were at least three critical facts, which you've already referred to in part. The first fact that the NCUA examiner pointed out to the board of directors is that, number one, you have this shared secured loan program. You have $131 million in allegedly shared secure loans. Not a single dollar is actually shared secured. So all the credence that the government wants to give in what the examiner said about how wonderful this program was and how secure it was, no loans were actually secured. In and of itself, that should have told the board. I don't understand how to ask about shared secured loans. And his answer was that a shared secured loan is a loan by a member who has, in the member's own account, deposits which would cover the loan. That's exactly right. And what you have to do is freeze that money so that member can't double dip, can't take a loan out. Let's say I've got $1,000 in my account. I come into the credit union. I want to take a $1,000 loan. I've got the money in my account, no problem. So I get the loan. And if I come in the next day and try to take that $1,000 out, that is a problem, unless, of course, it's been frozen so that I can't get the money that I put up as collateral. In this instance, in May of 2008, the board was told that not a single dollar that allegedly was shared secured was actually shared secured. It was all a fraud. I didn't use that word. Forgive me. They were told not a single dollar was actually secured. Just a simple example or analogy, which might be more telling. Let's say the example. You mean there were no shared secured loans? None. There were loans that were listed as shared secured. There were none that were actually shared secured. So the board had that huge fact. Where in the record do we find that the district court concluded that the board or the defendants actually knew about that? Well, they testified they received the report. We put into evidence the board minutes which showed that they received the report. There's testimony that they received the report. There's testimony that they remembered that fact. There is no explanation as to why they didn't do anything about it. But does that show that they knew at that time or subsequently, when they did know, that those reports were false? Well, the report wasn't false. The examiner was right. Nothing had been frozen. But what that should have told them is how can we have confidence in what this guy is saying about this wonderful program and that there's no risk because everything is secured when they're told nothing is secured? You're talking about discovery or termination right at this instant? I'm talking about discovery. I switched because I was trying to answer the court's question. And the second thing they were told, actually they were told several things, but the second thing they were told, which is astounding at least in my view, is that, by the way, gentlemen, you've loaned out $8.7 million more in money than you have shared securities on deposit. So if I have, let's say, $100 million on deposit and I've loaned out $120 million in shared securities, wait a minute, how can that be? So they're told that not a single dollar is secured, number one, and number two, that we've loaned out more money than we have in shared secured deposits. So the bells and whistles should have started ringing as soon as they received that report. And I wish the district judge had gone the next step and ruled as a matter of law that there was discovery, but he didn't. He stopped with dishonesty. But we've offered that as an alternate grounds that you can affirm on that basis. How much money was actually lost here? $130 million? Your Honor, you're going to have to ask the counsel of the government. They say $72 million was lost. They couldn't prove $5 million at trial, but the government says $72 million was lost. They couldn't prove $5 million. I don't think they did prove $5 million, and I'll get to that in a moment if I have any time left, but I'm running short. But the essential point that I was trying to answer in your question, they had these two facts. And, of course, they also knew that they had zero delinquencies for all these years. When they got this report in May of 2008, it had been six years. There's no financial institution in the United States that goes a year without no delinquencies, let alone six years. So they had all those facts. I think those facts, and it's a question this Court can decide because no reasonable juror could say that if you were told not a dollar was shared secured and you loaned out more than you had, no reasonable juror could say those aren't sufficient facts to lead you to believe that a loss could have been covered. To use a simple analogy, let's say the examiner hadn't looked at the shared secured loans, but looked at real estate loans. There was $31 million and said, gentlemen, I'm sorry to tell you this, but we looked in every real estate folder and not one piece of property on which you loaned money was actually subject to a lien. Not one piece of property. Now, anybody would know, wait a minute, we loaned out $31 million and we don't have a lien on any of the property? Something is radically wrong. That's exactly what the examiner was telling them. And they didn't do anything about it, and surprisingly the examiner didn't do anything about it. I see my time is running down. I'd just like to raise two other issues which I think are important for the Court to consider. It goes to the question of damages. The Lilly Report on which the government relies, obviously no one from Lilly testified. They want to say it's a business record. It's not their business record. They went to a third party to have this report complied. It's a forensic report. There's testimony in the record that it's based on the special expertise of the Lilly Company. So it's not admissible and shouldn't have been admitted. And it is their only evidence of damages. It is indeed an expert report that is not admissible as a business record because it didn't belong to them. If you'll permit me, one last question. What do you do with the argument that the termination clause only terminates with respect to activities that happened subsequent to the learning? That's what it says, and I'm not disagreeing with that. But as the Court correctly noted, and I'm not sure which of you asked the question, they didn't sue on the 2008 bond. By the time they got around to suing, it was on the 2010 bond, and there is no coverage. And we relied on the Fourth Circuit case on that point. There is no case which stands for the proposition he has offered. But if they had brought suit earlier – What's the law then? The law then is if you terminate before you even enter into the bond, then the bond is annullity? Is that it doesn't pay anything? No, no, the bond's not – Discovered because you learned of dishonesty before you entered into the 2010 bond? With respect to that individual? With respect to that individual. Right, right, no. He's the individual that's causing all the loss here, right? Right, but that's – The bond is with respect to him. But that's why the provision, once you learn of dishonesty, if you see that the teller is taking $10 every week, now $10 is not going to hurt most financial institutions. So that's causing a loss. What if you just learn he's dishonest? He's lied to you, for instance. Then coverage – He lied to you about something that didn't cause any loss, but he's lied. Then coverage – if that happens before you sign the 2010 bond, you're saying that all the things that you discover after that, during the discovery period, during the period in which your coverage extends, which is things that are discovered from 2010 to, what, a year later or whatever, that all of that coverage is gone totally or gone totally with respect to things that happened after you learned of the dishonesty. It's a hypothetical question. I'm not asking what happened in this case. I'm saying you enter into a bond in 2010, but in 2009, you learn that the person as to which you bought the bond lied about something. Coverage is gone. 2010 to 2011, even though what you discovered happened before you learned of the dishonesty. Exactly, Your Honor. That's the way the industry is. I say the opposite. I mean, we have to go look at the cases, I suppose, but it seems like an anomalous rule. Not at all. Why not? Because the principle of fidelity insurance, if you know of dishonesty, no carrier is going to insure. In fact, the case law says if you know of dishonesty before you take out the policy, there's no coverage for that particular individual. Now, the other individuals are covered, but that individual is not covered. There was a remedy for them. They didn't sue on the right bond. They didn't otherwise comply with the terms and conditions of the 2008 bond. In fact, they never introduced the 2008 bond in evidence, so there's no way they could recover on that bond. They don't know what the terms are, whether it provided for $1 million in coverage or $5 in coverage. The loss is discovered after 2010. The only thing that's discovered before is the dishonesty. But that's enough because that's the whole principle underlying this provision in this policy and the general case law that if you know someone, it doesn't matter who they stole from, if you know someone is dishonest before you try to insure them, there is no coverage for that individual. Otherwise, the system collapses. Because if you knew it and you had disclosed it, there wouldn't have been a bond. You'd be a great underwriter, Your Honor. That's exactly right. Thank you, Counsel. Thank you very much. Your Honor, first of all, Kalovitch himself made the distinction between reportable and non-reportable. He was the one who, in answer to a question, made the distinction in order to make it clear, and that's cited in our brief. It's not cited, but it's just you're attributing meaning to very few words. You could have said the reported delinquencies, and the listener would know he's drawing a huge distinction, or he could have just mumbled agreement using different words. I mean, who knows? Well, I think the court gave it a lot greater meaning than the testimony supports. Testimony before the court, or was this testimony before the court? It was testimony before the court. Yes. And the thing is that... They're basically saying no matter how great the negligence on the part of the board, looking into no delinquencies and carrying out their fiduciary duty, no matter how great the negligence, there was no liability. They still had no responsibility under the discovery provision to look into it. Well, we're talking about two things now. Under the termination agreement, no. Actually, the cases under both clauses say that there's no obligation on the board to investigate what it might have discovered. Why are they there? Well, Your Honor, they're there to exercise some supervision, but let's put it in context. They're lay people with other jobs. They're members of the credit union who are elected to this board. Who do they rely on, and rightfully so, the accountant? They don't know anything about what they're supposed to be doing. We're supposed to let them off the hook. Well, no, no. There are two things that are controls here, and it's actually critical. An accountant and examiners from the NCUA that come every year, and the report that counsel refers to for the 07 year, raising these two issues about shared secured loans not being frozen, apparently, and it was never established that they were not. The accountant and the investigator that comes from the government, they're not supposed to do anything here? No, they found these two things which they thought were technical problems, not any suggestion of dishonesty, anything that led to suspicion that some misconduct was going on, and the following year... So what good are they? Who are they? What good are they? Well, Your Honor, it may have been negligent. I can't. That was not in the record, but the following year, the two problems that they raised in the report that counsel refers to are not raised in the report. So it didn't appear to be a continuing problem to the examiners. So why is a lay person, no matter how long he has served on the board, supposed to read in to the evidence, the single fact that there are zero reported and reportable delinquencies, that Raguse is dishonest when his accountant isn't telling him that, and the examiners aren't telling him that, and every year that there's zero reported, they're saying, this is a good thing, looks good to us. That's what insurance is for, is to protect you when you screw up. And negligence, and the cases make clear that negligence isn't there. I only have a little time. I have a question about your response to their response to your statement about the retroactivity of this termination. Yes. Because it's sort of strange. It seems like if you know of the dishonesty, as they describe it, if you know of the dishonesty, then you have a bond contract. The bond contract just doesn't apply to people as to whom you know of dishonesty, even though when you discover the loss during the contract coverage period, that loss occurred prior to the discovery of the dishonesty. That's their theory, right? Well, it's conflating discovery of loss with learning of dishonesty. I'm not talking about discovery of loss. I'm talking about their theory of termination. They say this coverage never even started because it terminated at a time when you discovered. So you've entered into an already terminated obligation, and that obligation deals with things that you discover about loss in the oncoming year or two years, whatever the period is. Is it one year? Is it two years bond? I don't know how long. One year. All right. So it's loss that's discovered in the ensuing year, but if it's loss that results from a person you knew was dishonest before you entered into it, you don't get recovery for that because you knew when you entered into the bond contract that you had a dishonest person. But you seem to be saying you can enter into the bond contract knowing it's a dishonest person in order to recover losses that you subsequently discovered during that year that occurred prior to your obtaining knowledge of his dishonesty. Am I saying it right? Yes. Well, they say that's counterintuitive. That's anomalous. First of all, the language of the policy, the bond, says loss arising from acts occurring after the termination. Simple as that. The case law, fidelity, casualty, that's in the policy excerpt that we handed out. It's the end of the third paragraph. No coverage for loss occurring from acts occurring after the effective date of such termination. The cases that support the continuation, and the theory, of course, is if you continue to employ a dishonest person, whether it's because he was found cheating on his taxes or something related to his work at the bank, you do so at your risk, but you're still covered for something he did before you learned of it. Fidelity, casualty versus central bank. Home savings versus colonial. I know we've asked a million questions, but we're way over time on this case. Thank you very much. Thank you. I would rely on our briefs for the rest of the issues, including the admissibility of Lilly. Thank you. Thank you. The case will be submitted.